**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **M.S. and D.H., individually and on behalf of all others similarly situated,** ***Plaintiffs,*** | **C.A. No. 4:22-cv-187** |
| **v.** | **Hon. Charles Eskridge** |
| **MED-DATA, INC.,** ***Defendant.*** | **JURY DEMANDED** |

**DEFENDANT MED-DATA, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## Table of Contents


**INTRODUCTION** .......... **1**

**FACTS** .......... **1**

A. A MedData Employee Mistakenly Uploaded Personal and/or Health Care Data to GitHub, a Public Facing Website. .......... 1

B. When MedData Learned of the Data Incident, MedData Immediately Investigated and Took the Necessary Steps to Identify and Notify the Affected Individuals. .......... 2

C. There Is No Evidence the Data Uploaded to GitHub Was Improperly Accessed and/or Used for An Improper Purpose. .......... 4

1. Three Dark Web Searches Conducted Over the Last Two Years Show No Evidence that Plaintiffs, Or Any Person in the Class They Seek to Represent, Has Had Their PHI Available. .......... 4

2. GitHub Logs Do Not Provide Evidence that the MedData Data Uploaded to GitHub Has Been Accessed or Used For An Improper Purpose. .......... 5

**ARGUMENT** .......... **7**

A. Plaintiffs Lack Standing .......... 7

B. Plaintiffs Fail To Establish The Requirements for Class Certification. .......... 9

1. Rule 23 Standards. .......... 9

2. Plaintiffs Have Failed to Establish the Requirements of Rule 23(a). .......... 9

(a.) No numerosity or ascertainability. .......... 9

(b.) No commonality. .......... 10

(1.) No common questions for duty-based claims. .......... 11

(2.) No common questions as to contract-based claims. .......... 13

(3.) No common question for invasion of privacy claim. .......... 15

(4.) No common question for the unjust enrichment claim. .......... 15

(5.) Plaintiffs have not shown commonality as to their Washington Consumer Protection Act Claim and Missouri Merchandising Practice Act Claim. .......... 16

(6.) No commonality as to elements of causation and injury. .......... 17

(c.) No typicality. .......... 20

(d.) Plaintiff is not an adequate representative. ..................................... 21

3. Plaintiff Has Failed to Establish Rule 23(b) elements. ............................... 21

(a.) Rule 23(b)(3) predominance requirements are far more demanding than Rule 23(a)'s commonality requirement................. 22

(b.) Individualized questions of duty, causation and injury defeat a finding of predominance. ............................................................. 22

(c.) Class certification is also improper because class members are uninjured.......................................................................................... 23

(d.) Choice of law issues also defeat a finding of predominance. .......... 25

(1.) Plaintiffs bear the burden of establishing which laws apply and the absence of conflicts. ...................................... 25

(2.) Significant conflicts exist. .................................................... 26

(e.) The need or individual damage assessments defeats predominance. ........................................................................ 28

4. A class is inappropriate under 23(b)(2) because injunctive relief is moot. ............................................................................................... 29

**CONCLUSION ........................................................................................... 30**




281139806v.3

# Table of Authorities

**Cases**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1103 (N.Y. 2001)....31
*Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1057-58 (E.D. Mo. 2009)....18
*Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001)....7
Clapper v. Amnesty International, USA, 568 U.S. 398, 416, 133 S. Ct. 1138 (2013)....21
*Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007)....28
*Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S. Ct. 1426, 1432 (2013)....10
*Donastorg v. Daily News Publ'g Co.*, 63 V.I. 196, 319 (V.I. Super. Ct. 2015)....31
*Evans v. Rite Aid Corp.*, 324 S.C. 269, 273, 478 S.E.2d 846, 848 (1996)....13
*Fleming v. Select Portfolio Servicing*, 342 F.R.D. 361, 366-67 (D. Mass. 2022)....32
*Gardner v. Health Net, Inc.*, No. CV 10-2140 PA (CWX), 2010 WL 11579028, at *4 (C.D. Cal. Sept. 13, 2010)....19
*General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 2370 n.13 (1982)....23
*Georgine v. Amchem Prods.*, 83 F.3d 610, 618 (3d Cir.1996)....28
*Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1230 (N.D. Cal. 2022)....21
*Howard v. Aspen Way Enterprises, Inc.*, 2017 WY 152, ¶ 14, 406 P.3d 1271, 1275 (Wyo. 2017)....31
*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 308 (N.D. Cal. 2018)....14
*In re Brinker Data Incident Litig.*, No. 3:18-CV-686-TJC-MCR, 2021 WL 1405508, at *6 (M.D. Fla. Apr. 14, 2021)....11
*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 341 F.R.D. 128, 138 (D. Md. 2022)....13
*In re TJX Cos. Retail Sec. Breach Litig.*, 524 F. Supp. 2d 83, 92 (D. Mass. 2007)....31
*In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2020 WL 5778756, at *16 (E.D. Va. Aug. 14, 2020)....25
*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009)....26
*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130 (1992)....8
*McGlenn v. Driveline Retail Merch., Inc.*, No. 18-CV-2097, 2021 WL 165121, at *6 (C.D. Ill. Jan. 19, 2021)....19

*Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 923 (10th Cir. 2018) .................................... 17
*Milliken v. Mathiason*, No. 14-20-00246-CV, 2022 WL 220235, at *5 (Tex. App. Jan. 25, 2022, no pet. h) ........................................................................ 16
*O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669 (1974) ............................................ 7
*Odom v. U.S. Homes Corp. of Texas*, 76 F.R.D. 381, 383 (S.D. Tex. 1975) .................... 11
*Rivera v. S. Green Ltd. P'ship*, 208 S.W.3d 12, 22-23 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ........................................................................ 15
*Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 377 (Colo. 1997) .................................. 22
*Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, at *2 (M.D. Ala. Mar. 17, 2017) ........................................................ 14
*SOP, LLC v. DWP Gen. Contracting, Inc.*, No. 56061-5-II, 2022 WL 17590865, at *4 (Wash. Ct. App. Dec. 13, 2022) ................................................ 30
*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175-78 (3d Cir. 2008) ........................................................................................................ 30
*Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009) .......................................................................................... 34
*Sweet v. Pfizer*, 232 F.R.D. 360, 370 (C.D. Cal. 2005) ................................................... 23
*Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993) ................................................ 17
*Valeriano v. Rome Sentinel Co.*, 43 A.D.3d 1357, 842 N.Y.S.2d 805 (2007) .................. 13
*Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 222, 300 Cal. Rptr. 3d 32, 49 (2022) ........................................................................................ 26
*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 2550 (2011) ........................................................................................................ 9
*Zurich Am. Ins. Co. v. Hughes, Watters & Askanase, L.L.P.*, No. 11-05-00044-CV, 2006 WL 1914689, at *2 (Tex. App. July 13, 2006) .......................... 31

**Statutes**

42 Pa. Cons. Stat. § 7102 ................................................................................................ 30
45 C.F.R. § 160.103 ........................................................................................................ 12
Federal Rule of Civil Procedure 23 .................................................................................... 9
HIPAA, 42 U.S.C. § 17921 .............................................................................................. 10

**Other Authorities**

https://www.foley.com/en/insights/publications/2019/01/state-data-breach-notification-laws ........................................................................................... 11
https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed ................................. 20

**Rules**

Ala. R. Civ. P. 8 ............................................................................................................... 30

# I. INTRODUCTION

Plaintiffs' Motion for Class Certification ("Motion") should be denied for at least the following reasons. First, Plaintiffs have failed to establish standing – *i.e.*, given the fact that there is no evidence that their data was accessed and used by an unauthorized person, they cannot establish any injury. Second, Plaintiffs fall far short of meeting their burden of establishing Rule 23's requirements of commonality, typicality and predominance. Instead, given the non-uniform personal identifying and health information at issue here, and the related variation in risk factors among class members, Plaintiffs cannot establish causation and injury on a classwide basis. Similarly, given the lack of any evidence that the Plaintiffs and the class members[1] have been victims of identity theft or health care fraud and the inability to assess damages on a classwide basis, they cannot establish commonality or predominance for damages. In short, this case is particularly ill-suited for class certification and Plaintiffs' Motion should be denied.

# II. FACTS

## A. A MedData Employee Mistakenly Uploaded Personal and/or Health Care Data to GitHub, a Public Facing Website.

MedData is a national provider of revenue cycle management services for hospitals and healthcare systems. (Ex. 1 attached hereto, Briggs Dep. at 7:25-10:14). MedData necessarily utilizes patients' personal and health information obtained from its clients in order to provide these services. (*Id.* at 11:7-12:25).

[1] Putative class members are referred to herein simple as "class members."

This case arises out of a data security incident ("Data Incident") resulting from a violation of MedData's policies by Zulfiqar Faruqi ("Faruqi"), a former MedData software developer.[2] (*Id*. at 14:21-15:17). In the course of his employment at MedData, Faruqi had access to proprietary MedData system source code. (Ex. 2 attached hereto, Faruqi Aff. at ¶3). Between September 2019 and December 2020, Faruqi saved proprietary MedData source code to an online source code repository that he created on GitHub.com, a platform used by software developers.[3] (Ex. 2, Faruqi Aff. at ¶4); (Ex. 3 attached hereto, Faruqi Dep. at 177:17-21). Unbeknownst to Faruqi at the time, the MedData source code files he saved to GitHub contained raw data that included various personal and health information data for approximately 142,000 patients of MedData clients. (Ex. 2, Faruqi Aff. at ¶¶5-6). Faruqi was not aware the source code he saved in his GitHub repository was publicly viewable. (*Id.* at ¶6).

### B. When MedData Learned of the Data Incident, MedData Immediately Investigated and Took the Necessary Steps to Identify and Notify the Affected Individuals.

On or about December 10, 2020, a journalist informed MedData that an ethical hacker by the name of Jelle Ursem, had identified data on GitHub's publicly available site that appeared to be from MedData and that contained patient PHI. (Ex. 1, Briggs Dep. at 21:16-22:1). MedData immediately launched an investigation. (*Id.* at 24:25-26:1). After Bassett accessed Faruqi's files and confirmed the accuracy of the journalist's information,

[2] Mr. Faruqi was employed by MedData from December 25, 2018 to September 27, 2019. The facts set forth in this paragraph are based on an affidavit provided to MedData by Faruqi. *See* Ex. 2.

[3] https://github.com

MedData had the source code folders containing the raw data at issue removed from GitHub on or about December 17, 2020. (*Id*. at 21:18-22:25; 41:2-3). MedData also asked GitHub to provide daily fetch and page view numbers. (Bassett Decl., Ex. A, previously filed at ECF #60-1). GitHub was able to provide a log of fetches that included git clone, git fetch, and git pull, but not the identity of the person or persons who accessed the files. *Id.* Although Plaintiff speculates that the files were accessed and copied by unauthorized persons, there is no evidence that anyone other than Faruqi, Ursem and Bassett accessed or copied the files.

MedData also promptly retained consulting and technology firm, Crowe LLP, to aid MedData in deciphering the raw data that Faruqi had posted on GitHub. (Ex. 1, Briggs Dep. at 27:18-28:14). With Crowe's assistance, MedData ultimately identified approximately 142,000 unique individuals located in 50 different states. The investigation also showed that the nature of data uploaded to GitHub was not uniform across all of the individuals. For example, some individuals had only their name, address, phone number and date of birth uploaded to GitHub, while others had their name, address and medical insurance, and still others, had some combination of this information, plus Social Security numbers. In all, MedData identified 21 distinct groupings of information uploaded to GitHub. (Ex. 4 attached hereto, Table of Information). As soon as MedData identified the individuals, MedData then notified all potentially impacted persons. (Ex. 1, Briggs Dep. at 203:25-204:3; 206:7-18).

Both M.S. and D.H. received a letter dated March 31, 2021, from MedData notifying them of the Data Incident ("Notice Letter"). (Ex. 5 attached hereto, M.S. Dep. at 20:3-18

& Ex. 6 attached hereto); (Ex. 7 attached hereto, D.H. Dep. at 15:16-16:14 & Ex. 8 attached hereto). The Notice Letters informed both Plaintiffs that the data involved "may have contained your name, Social Security number, physical address, date of birth, telephone number, and medical condition and diagnosis." (Exs. 6 & 8). It further advised that MedData was "not aware of any misuse of your information…" and offered twelve months of free credit monitoring and identity protection services through a service called IDX. (*Id.* at 2). In addition, MedData offered each Plaintiff a $1,000,000 insurance reimbursement policy and fully managed ID-theft recovery services. (*Id.*) The Notice Letter also suggested a variety of steps Plaintiffs could take to further protect themselves. (*Id.*) Although M.S. availed herself of these free services, D.H. chose not to because she did not trust a company recommended by MedData. (Ex. 5, M.S. Dep. at 25:2-16); (Ex. 7, D.H. Dep. at 25:6-26:1).

**C. There Is No Evidence the Data Uploaded to GitHub Was Improperly Accessed and/or Used for An Improper Purpose.**

**1. Three Dark Web Searches Conducted Over the Last Two Years Show No Evidence that Plaintiffs, Or Any Person in the Class They Seek to Represent, Has Had Their PHI Available.**

On or about March 2019, MedData's cybersecurity consultant, Clark Hill, conducted an investigation to determine whether the MedData raw data uploaded to GitHub was available on the Dark Web. Clark Hill's Dark Web search included:

- Scanning in English and Cyrillic markets well known for selling PII and other related data and 37 other darknet markets;
- Actively monitoring layers of darknets; in English, Cyrillic, Mandarin, and Farsi and accessing a series of private networks where such data is sold; and

- Placing beacons to monitor for anything related to MedData.

Clark Hill's broad and deep reconnaissance of the dark web found no indication that any of the MedData raw data uploaded to GitHub had been accessed or placed on the Dark Web for sale. (Ex. 9 attached hereto, Clark Hill Report).

On or about June 2022, MedData had another cybersecurity vendor, Arete Advisors, conduct a Dark Web search. Arete Advisor's search found no indication that any of the Plaintiffs' raw data uploaded to GitHub had been accessed or placed on the Dark Web for sale. (Ex. 10 attached hereto, Arete Advisors Report). In January 2023, MedData again commissioned a Dark Web search of a statistically significant sample of all class members. That search, which was completed in the last several days, found that none of the raw data of class members has been made available for sale on the Dark Web. The written Report for Dark Web search will be filed as a supplement as soon as received by MedData.

**2. GitHub Logs Do Not Provide Evidence that the MedData Data Uploaded to GitHub Has Been Accessed or Used For An Improper Purpose.**

Plaintiffs state that the GitHub logs provided to MedData show "unknown individuals" viewed and copied Plaintiffs' PHI.[4] Motion at 2. Plaintiffs, however, base their position on pure speculation, not admissible evidence.[5] Neither the GitHub Logs nor

[4] Plaintiff cites to an email from Kevin Bassett, a MedData employee, in which he speculated regarding the meaning of the Logs. ECF# 58-2. But Bassett has no personal knowledge regarding the accuracy or interpretation of the Logs. (Bassett Decl. ECF #60-1 at ¶¶3-5).

[5] The Logs are inadmissible hearsay. Fed.R.Evid. 801. No hearsay exception applies. No GitHub custodian or other qualified person has certified that the Logs are "a record generated by an electronic process or system that produces an accurate result," or has any custodian or other qualified person made the certification available for inspection so MedData has a fair opportunity to challenge them." Fed.R.Evid. 902(11) & (13).

any other information GitHub was able to provide identifies the persons who accessed Faruqi's files. The only admissible evidence that identifies the individuals who accessed Faruqi's files on GitHub is (1) Faruqi's testimony that he accessed the files during the entire period until the files were removed from GitHub on December 17, 2020, and (2) declarations by Jelle Ursem and Kevin Bassett, MedData's CTO, that they accessed the files in November and December 2020.

Faruqi testified that he worked on his GitHub files, including the PHI files, regularly while developing "rules engine" software for MedData; and that he continued to work on the "rules engine" via GitHub after he left MedData. (Ex. 3, Faruqi Dep. at 159:2-161:21; 171:2-173:5; 183:4-189:1). Contrary to Plaintiffs' speculation that their PHI was "'cloned' [copied] thirty-five times by unknown and unauthorized individuals," Faruqi testified that he made all 35 copies. *Id.* Moreover, Faruqi testified his GitHub dashboard would show a "spike" if anyone else accessed his files and he never saw a "spike." (*Id.* at 123:1-18; 124:3-9; 164:11-168:10; 181:12-182:5; 204:5-205:23).

Jelle Ursem, the "ethical hacker" who found PHI in Faruqi's GitHub files, signed a declaration in which he stated that he looked at the GitHub files in November 2020. (ECF #58-1, Ursem Decl. at ¶3). And Kevin Bassett, MedData's CTO, sent emails on December 14, 2020 describing his findings from viewing the Logs. (Bassett Decl. at ¶¶7-11, previously filed at ECF #60-1). Plaintiffs offer no comparable evidence to support their contention that "unknown persons" accessed the files. There is simply no evidence in the

Logs or the record before this Court that "unknown persons" viewed or copied Faruqi's GitHub files.

## III.
## ARGUMENT

### A. Plaintiffs Lack Standing

Standing is an inherent prerequisite to the class certification inquiry. *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001). MedData has previously moved to dismiss this case based on Plaintiffs' lack of standing. ECF #55 ("Motion to Dismiss"). The Motion to Dismiss is still pending. The threshold issue of standing could be determinative of the certification issue. Specifically, if the class representative plaintiffs fail to establish standing, they may not seek relief on behalf of themselves or any other member of the class. *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669 (1974). Because this threshold issue has not yet been decided, MedData hereby incorporates its Motion to Dismiss and the reply thereto (ECF #60) by reference and urges the Court to determine standing before proceeding to the Rule 23 analysis.

In brief summary, to satisfy the Article III standing requirements, Plaintiffs must show that: (1) they suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130 (1992). As set forth in MedData's Motion to Dismiss and Reply thereto, MedData is unaware of any case in which standing has been

found in a case such as this one, where data was temporarily vulnerable to exposure, *but where there was no evidence that the data was ever actually accessed or misused by third party bad actors.* Instead, standing has only been found where the data at issue has *actually been stolen or misused* by third party bad actors, such as through hacking or theft. *See* ECF #60 (Reply to Motion to Dismiss).

In each of 2021, 2022 and 2023, more than 40 million American's have been victims of healthcare data breaches. (https://www.hipaajournal.com/healthcare-data-breach-statistics/). Granting standing without proof that the data has been misused would flood the federal courts with an unmanageable volume of litigation. In this case, Plaintiffs have not shown that their data was ever accessed or misused by a third party or that that they suffered actual, non-speculative injury in fact as a result of that breach. Plaintiffs' only support for their theory of actual injury for any of their claims is their speculation that because the files were "cloned", they must have been accessed by unauthorized third parties. Motion, 1 (ECF #67). However, Plaintiffs' unsupported speculation is directly contradicted by the actual evidence, which explains that the "cloning" only reflects access by MedData's former employee, Faruqi. *See supra*, Section II.C.2. Plaintiffs offer nothing to contradict this evidence and thus fails to show that their data has actually been accessed and misused by third parties. Failing to establish sufficient injury in fact to support standing for any of their claims, the analysis should end there and Plaintiffs' Motion should be denied.

**B. Plaintiffs Fail To Establish The Requirements for Class Certification.**

**1. Rule 23 Standards.**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701, 99 S. Ct. 2545 (1979)). Federal Rule of Civil Procedure 23 ("Rule 23"), which sets forth the requirements for a class action, "does not set forth a mere pleading standard." *Wal-Mart Stores,* 564 U.S. at 350. Rather, Rule 23(a) requires a plaintiff to affirmatively demonstrate its requirements, including that the class action presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representative will adequately represent the class. *Id.,* 351. If a plaintiff satisfies Rule 23(a)'s requirements, he or she must then also show that the proposed class action meets one of the three requirements of Rule 23(b) through evidentiary proof, *Comcast Corp. v. Behrend,* 569 U.S. 27, 33, 133 S. Ct. 1426, 1432 (2013). A court must engage in a "rigorous analysis" to determine if the plaintiff has carried his or her burden to establish Rule 23's requirements. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011). Plaintiffs have failed to do so here.

**2. Plaintiffs Have Failed to Establish the Requirements of Rule 23(a).**

**(a.) No numerosity or ascertainability.**

Plaintiffs propose two classes–a nationwide class and a Missouri state subclass, each of which is composed of persons "whose PII or PHI was exposed as a result of the MedData Healthcare Data Breach that occurred from sometime between December 2018 and

September 2019 through December 17, 2020." Motion, 1. Each of these proposed classes are defined to include those whose data was involved in a "breach." A data "breach" means an unauthorized access by a third-party. *See,* HIPAA, 42 U.S.C. § 17921 (defining "breach" to mean the disclosure to a third party who would not otherwise have access to the information and excluding situations (such as this case) where an employee inadvertently uses or accesses PHI in good faith and the use does not lead to further disclosures to unauthorized third parties).[6] Thus, by its own definition, the class is limited to only those whose data was actually "breached." *Id.*[7]

Applying this definition, Plaintiffs cannot show that the number of class members whose data was actually breached is numerous because, in fact, no evidence exists that any of the class members' data was accessed or misused by unauthorized third parties. Being unable to make any showing that any of the class members' data was actually breached, Plaintiffs have not established numerosity.

**(b.) No commonality.**

Pursuant to Rule 23(a), putative class plaintiffs carry the burden to establish the element of commonality. *See, e.g., Odom v. U.S. Homes Corp. of Texas*, 76 F.R.D. 381, 383 (S.D. Tex. 1975). Specifically, Plaintiffs carry the burden of establishing that the class members have suffered the same injury such that their claims can be productively litigated

[6] See also https://www.foley.com/en/insights/publications/2019/01/state-data-breach-notification-laws, which summarizes the definition of "breach" for each state.

[7] Plaintiffs have not limited the proposed class to only those who were injured as a result of the breach. Thus, the definition is also improperly broad because it includes large numbers of uninjured members. *In re Brinker Data Incident Litig.*, No. 3:18-CV-686-TJC-MCR, 2021 WL 1405508, at *6 (M.D. Fla. Apr. 14, 2021).

at once. *Wal-Mart Stores, Inc.*, 564 U.S. at 350. This means Plaintiff must not only raise common "questions" but also demonstrate "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009) (emphasis in original). In this case, there are no common issues that show that the class action has the capacity to generate common *answers* apt to drive the resolution of this litigation.

**(1.) No common questions for duty-based claims.**

Plaintiffs allege there are common issues of the duty to protect class members' PHI and PII and whether MedData took adequate precautions to protect their PHI and PII in light of that duty. (Motion at 6). However, these issues do not lead to common answers. Plaintiffs assert several claims that involve the element of duty: negligence, negligence per se; negligent training and supervision; and breach of fiduciary duty of confidentiality. Compl., ¶¶116-133; 134-151; 170-177; 186-192 (ECF #1). The element of duty for each of these claims will necessarily depend on the type of information at issue for each class member. For example, Plaintiffs allege that the duty to protect the Plaintiffs' and class member's data arises from HIPAA. *Id.* ¶¶134-151. However, the duty created by HIPAA only applies to medical information. *See* 45 C.F.R. § 160.103.[8] As discussed above, the categories of data at issue for each class member varies greatly, with many putative class

[8] 45 C.F.R. § 160.103 defines HIPAA health information to mean information relating to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

members having no medical information involved in the Data Incident. For those whose data involved non-medical data, HIPAA would not create the duty. Instead, the analysis as to whether and to what extent MedData had a duty to protect the information will be governed by common law standards, with variations in the duty depending on the type of information involved for each class member and which jurisdiction's laws apply. *See, e.g.*, *Evans v. Rite Aid Corp.*, 324 S.C. 269, 273, 478 S.E.2d 846, 848 (1996) (finding no common law independent duty for pharmacists to maintain confidentiality of customer information); *Valeriano v. Rome Sentinel Co.*, 43 A.D.3d 1357, 842 N.Y.S.2d 805 (2007) (Plaintiffs could not assert a negligence claim against newspaper for publishing plaintiff's name, address, date of birth, and Social Security). For those class members whose data included only information that was already in the public domain such as through their public social media accounts (*e.g.*, names or dates of birth), MedData is unaware of any common law duty to maintain the confidentiality of public information.

In contrast to the situation here, where there are great variations among the class members as to the type of data at issue, the cases cited by Plaintiffs (Motion at 7) involve a breach of the same type of data for the entire class. *See In re Brinker Data Incident Litig.*, 2021 WL 1405508, at *1 (the breach involved the same type of data for each class member–customer payment card data and related payment card PII); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 138 (D. Md. 2022) (hotel chain's data breach involved data base of guest records, which included information provided when making reservations, including guests' name, address, email address, phone number, and

payment card information).[9] Unlike these cases, this case will involve unique inquiries for each class member depending on the type of data at issue and the duty associated with that type of data. In short, Plaintiffs have not carried their burden of identifying a common classwide question of duty.

**(2.) No common questions as to contract-based claims.**

Plaintiffs have not explained how they will show a common contractual theory for the proposed class. The two cases cited by Plaintiffs offer no guidance because they involve situations in which the class members had a direct contractual relationship with the defendant. For example, in *Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, at *2 (M.D. Ala. Mar. 17, 2017), the defendant was a hospital who had a lab employee who stole patients' files and used them with other third parties to create fraudulent tax returns. *Id.* In certifying the class for an implied contract claim, the court found that a contractual relationship arose from the physician-patient relationship between the hospital and its patients, which was a common issue that all the putative class members could prove through common evidence – *i.e.*, their registration as patients at the hospital. *Id.* at *12.

*In re Marriott Int'l.* also involved a direct contractual relationship – in that case between hotels and their customers, with the contract arising out of an express contract between the defendant and the customers. *In re Marriott Int'l, Inc.*, 341 F.R.D. at 156.

---

[9] The other case cited by Plaintiffs, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 308 (N.D. Cal. 2018), is a settlement case and does not clearly discuss the type of data at issue. Because settlement approval cases are in a different posture than contested certification motions (*i.e.*, the defendant does not contest that the class requirements have been met), they offer little guidance here.

Unlike either *Smith* or *In re Marriott,* in this case there was no contractual relationship between the Plaintiffs and MedData. MedData's contractual relationships were with third-party medical facilities and not with Plaintiffs, who were patients at the non-party medical facilities. Plaintiffs have not shown how they will establish through common evidence that either they or any of the class members have any direct or implied contractual relationship with MedData.

Plaintiffs also fail to show how their third-party beneficiary claim can be resolved through common questions. Plaintiffs cite to a Texas case*, Rivera v. S. Green Ltd. P'ship*, 208 S.W.3d 12, 22-23 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) for the elements of this claim. (Motion 13). Assuming, *arguendo*¸ that Texas law applies, *Rivera* explains that "[a] third-party beneficiary contract cannot be created by implication. *Id.* at 22. "[A] third-party beneficiary will not be recognized unless the intent to make them so is clearly written or evidenced in the contract." *Id.* Thus, "the fact that a person is directly affected by the parties' conduct, or that he 'may have a substantial interest in a contract's enforcement, does not make him a third-party beneficiary.'" *Id.* at 22-23. "If there is any reasonable doubt as to an intent to confer a direct benefit, the third-party beneficiary claim must fail." *Id.* at 23. In this case, in order to determine if the class members were intended third-party beneficiaries, the Court would need to review each contract between MedData and each medical care provider to determine if each of those contracts clearly intended for the class members to be third-party beneficiaries. If each contract does not evidence this intent, the class members are only incidental beneficiaries and not third-party beneficiaries. *Id.* This individualized inquiry defeats commonality.

**(3.) No common question for invasion of privacy claim.**

Plaintiffs have also failed to show common issues for their invasion of privacy claims. Assuming, *arguendo,* that Texas law applies (since Plaintiffs cite to Texas law), the elements for an invasion of privacy claim are that the defendant (1) intentionally intruded, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns; (2) the intrusion would be highly offensive to a reasonable person; and (3) the intrusion injured the plaintiff. *Milliken v. Mathiason*, No. 14-20-00246-CV, 2022 WL 220235, at *5 (Tex. App. Jan. 25, 2022, no pet. h). In this case, the large variations in the type of data at issue for each class member would require an individualized assessment as to whether a reasonable person would be highly offended by the exposure of each type of data at issue for each class member. The claim would also require an individualized assessment as to the third element–injury–*i.e.*, whether each plaintiff actually felt any distress at the invasion.[10] There are no common questions leading to common answers.

**(4.) No common question for the unjust enrichment claim.**

Plaintiffs' unjust enrichment claim also fails the commonality analysis. Plaintiffs cite to a Colorado case, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 923 (10th Cir. 2018), in support of their unjust enrichment claim. As *Menocal* explains, an unjust enrichment claim typically includes the following elements: (1) the defendant received a benefit (2) at the

[10] The invasion of privacy cause of action will not survive summary judgment as the first element requires an intentional intrusion on privacy. *Valenzuela v. Aquino,* 853 S.W.2d 512, 513 (Tex. 1993) (an invasion of privacy claim requires an intentional intrusion upon one's seclusion or private affairs). Plaintiffs have not alleged an intentional invasion and here is no evidence that the Data Incident was intentional, as opposed to a negligent mistake by Faruqi.

plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation. *Id.* Unlike *Menocal,* the Plaintiffs' unjust enrichment claim has the glaring problem that Plaintiffs have not alleged that they provided any benefit to MedData. In their Complaint, Plaintiffs allege that the monetary benefit that MedData received was from the third-party medical providers with whom MedData had contracts – not from Plaintiffs. Compl., ¶167. Plaintiffs have not shown how they will prove this (non-existent) benefit on a classwide basis.

**(5.) Plaintiffs have not shown commonality as to their Washington Consumer Protection Act Claim and Missouri Merchandising Practice Act Claim.**

Plaintiffs assert two state consumer protection act claims –Washington's Consumer Protection Act ("WCPA"), RCW 19.86, *et seq.,* and Missouri's Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.*[11] Motion, 14-15. As with their other claims, Plaintiffs assert that these claims arise out of MedData's failure to protect PHI and PII, which has resulted in the public disclosure of Plaintiffs' and the class's PHI and PII, which resulted in injuries. (Motion at 14-15). Similar to the negligence and fiduciary duty claims, Plaintiffs have failed to carry their burden of showing how the Consumer Protection Act claims share commonality given the wide variety of data categories at issue for each class member–ranging from both PHI and PII, to only PII, to only publicly available

[11] It should be noted that the MMPA claim is unlikely to survive summary judgment as Plaintiffs are unable to show the required evidence that they paid MedData for any services or merchandise. Any payments for services or merchandise by Plaintiffs was to their medical care providers, not MedData. *See, Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1057-58 (E.D. Mo. 2009) (dismissing MMPA claim in data breach case when Plaintiffs failed to show that breach was in relation to the plaintiff's purchase of merchandise from the defendant).

information. Further, as discussed below, there is no commonality as to causation or alleged injuries for these claims. In short, there are no common answers across the putative class as to the WCPA and MMPA claims.

**(6.) No commonality as to elements of causation and injury.**

In addition to the lack of commonality with regards to the duty and other elements of their claims, all of Plaintiffs' causes of action require individualized inquires for the issues of causation and injury, also defeating commonality. As one court explained, the elements of causation and injury in a data breach case are particularly challenging. *Gardner v. Health Net, Inc.*, No. CV 10-2140 PA (CWX), 2010 WL 11579028, at *4 (C.D. Cal. Sept. 13, 2010) (denying class certification in data breach case and noting that "the theft of a potential class member's identity could be the result of any number of causes."). To determine if the Data Incident caused each class member an injury will require individual determinations as to whether each class member's data was actually misused by a third party and whether that misuse is the proximate cause of any alleged injury. *See, e.g., McGlenn v. Driveline Retail Merch., Inc.*, No. 18-CV-2097, 2021 WL 165121, at *6 (C.D. Ill. Jan. 19, 2021) (refusing to certify class in data breach case in part because the individualized issues of causation, injury, and damages precluded a finding of commonality, even if plaintiff could state a common theory of liability).

In addition, the possibility that a member's data was subject to a prior exposure creates factually intense issues to determine if the other data breaches were the actual cause of any alleged injuries. Specifically, individualized discovery will be required to determine if class members were contributorily negligent in failing to protect their data. M.S. testified

that her full social security number has been publically available since January 2008 when a document containing it was publically filed in bankruptcy court. (Ex. 5, M.S. Dep. at 68:2-16) (*see also* Case 07-22700, Claim 7-1, page 2 of 3, Filed 01/23/08 in the United States Bankruptcy Court, District of Kansas). Even she could not speculate whether the "suspicious things" happening to her were from that filing in the bankruptcy court or the GitHub incident. (Ex. 5, M.S. Dep. at 68:2-16). And even after learning about this in her deposition in this case in June of 2022, there appear to have been no filings in the District of Kansas Bankruptcy Court to correct this.

MedData's damage expert explains that numerous other healthcare data breaches have occurred in which class members' healthcare data could have been involved. (Ex. 11 attached hereto, Gurrea Report, Exhibits 8A and 8B (listing the largest healthcare data breaches since 2005 and 2011, respectively)).[12]

As with causation, individualized inquiries injuries defeat a finding of commonality. To the extent Plaintiffs and class members share a commonality with regards to the fact of injury, it is that they have not been injured by the Data Incident.

While data was temporarily more vulnerable during the Data Incident, there is no evidence it was ever accessed or improperly used by third parties, thus negating the possibility of injury. However, even assuming, *arguendo*, that Plaintiffs were able to establish issues of fact as to whether the data was accessed by cybercriminals, they have

---

[12] Citing https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed. Given that more than 1 *billion* Americans have been victims of data breaches in 2020-2021, individual inquiries would be necessary to determine whether potential class members' data was already publicly available.

not alleged commonality with regards to the fact of injuries that allegedly resulted. Instead, Plaintiffs allege a wide variety of injuries: 1) unspecified injuries flowing from actual and potential future fraud and identity theft; 2) imminent and impending risk of spam callers trying to defraud them; 3) unspecified damages; 4) loss of privacy; 5) expenses and the value of time in mitigating the effects of the Data Incident;[13] 6) deprivation of the value of the allegedly disclosed information; 7) loss of use and access to credit, accounts and/or funds; 8) damages to credit due to the fraudulent use of PHI and PII; 9) increased cost of borrowing, insurance, deposits or "other items which are adversely affected by a reduced credit score; 10) loss of the benefit of the bargain; 11) embarrassment or humiliation; 12) emotional distress; or 13) loss of enjoyment of life. Compl., ¶¶93, 164, 176, 185, 191 (ECF #1).

Determining whether each class member actually suffered any, some, or all of these types of injury will require a highly fact-intensive inquiry for each member, including addressing the significant variations in the type of data that was involved and whether the data that was disclosed to third parties was of the type that could lead to the alleged injury.

The alleged injury of emotional distress is especially individualized. Whether Plaintiffs experienced emotional distress will not answer the question of whether other

[13] With respect to monitoring costs, such costs are not the injury–they are only an element of the damages that can be awarded only after a separate injury has been found. A generalized increased risk of future harm, or steps taken to mitigate that generalized increase of harm (i.e., monitoring costs), do not qualify as the injury. *Clapper v. Amnesty International, USA*, 568 U.S. 398, 416, 133 S. Ct. 1138 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"); *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1230 (N.D. Cal. 2022) ( "mitigation expenses do not qualify as injury; the risk of identity theft must first be real and imminent, and not speculative, before mitigation costs establish injury in fact").

class member also did. This will be particularly so for those class members who had only publicly available data involved in the Data Incident, the disclosure of which, as a matter of law, could not result in liability. *See, e.g., Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 377 (Colo. 1997) ("The disclosure of facts that are already public will not support a claim for invasion of privacy."). In short, there is no one common inquiry that will address the fact or type of injury among the entire class.

**(c.) No typicality.**

Rule 23(a)'s typicality requirement requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FRCP 23(a)(3). The typicality requirement is not met in an action that would require individualized inquiries regarding causation and injury. *See, e.g., Gardner*, 2010 WL 11579028, at *3-4 (no typicality in data breach case where plaintiff was not able to show that other class members suffered similar injury as plaintiff).

In a data breach case, the fact that a plaintiff and class members share the same circumstance of having received a notice of a data incident is not enough to establish typicality. As the *Gardner* court explained:

> Here, even if Plaintiffs are similar to the proposed class members insofar as they provided their information to Defendant and received Defendants' Notice Letter, these allegations only tend to show that this action is based on conduct that is not unique to the named plaintiffs. Plaintiffs have not shown whether other class members have been injured by the same course of conduct, or have consequently suffered from the same or similar injury. Indeed, . . . it is apparent that a number of individualized inquiries would be required to prove both Defendant's liability and the amount of damages . . . . Among these inquiries are: whether each class member's personal information was actually exposed; whether each class member actually suffered from identity theft after the hard drive was stolen; whether this

> identity theft is traceable to the stolen hard drive; whether the class member previously took measures to protect their personal information from such identity theft; when and whether each class member enrolled in the credit and identity protection services offered by Defendant; and whether each class member relied on Defendant's representations regarding circumstances surrounding the security breach and the procedures in place to safeguard his or her personal information.

*Id.* 3. The court concluded that "individual issues regarding causation and injury prevent the Court from finding that Plaintiffs are able to meet the typicality requirement." *Id.*, *5. The same analysis applies here. As in *Gardner*, Plaintiffs cannot show typicality because of the great variations in questions relating to duty, causation, and injury.

**(d.) Plaintiff is not an adequate representative.**

"When courts have determined that typicality is absent because there are too many divergent individual issues among plaintiffs, they will also hold that adequacy of representation is lacking." *Sweet v. Pfizer*, 232 F.R.D. 360, 370 (C.D. Cal. 2005); *see also General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 2370 n.13 (1982) (noting that typicality and commonality tend to merge into adequacy). Here, the abundance of individualized issues preventing the Court from finding typicality similarly should also prevent the Court from finding that Plaintiff will fairly and adequately protect the interests of the class. *Gardner*, 2010 WL 11579028, at *5. In summary, Plaintiff has fallen far short of establishing that the proposed class meets Rule 23(a) requirements.

**3. Plaintiff Has Failed to Establish Rule 23(b) elements.**

Although the analysis could stop with Plaintiffs' failure to meet Rule 23(a)'s requirements, the class should also not be certified because Plaintiff cannot meet Rule

23(b)'s more stringent requirements due to the myriad of individualized issues that preclude a finding of predominance.

**(a.) Rule 23(b)(3) predominance requirements are far more demanding than Rule 23(a)'s commonality requirement.**

Rule 23(b)(3) applies to class actions when the proposed class seeks money damages. *McGlenn v. Driveline Retail Merch., Inc.,* No. 18-CV-2097, 2021 WL 165121, at *8 (C.D. Ill. Jan. 19, 2021). To satisfy their burden under Rule 23(b)(3), Plaintiffs must show that questions of law or fact common to class members predominate over any questions affecting only individual members. Rule 23(b)(3). While similar to Rule 23(a)'s requirements for typicality and commonality, the predominance criterion in Rule 23(b) "is far more demanding." *Amchem Prods.*, 521 U.S. at 623-24. Predominance is lacking, and a class should not be certified, when the case is defined by individualized inquiries regarding issues of causation, injury and damages. *See, e.g., McGlenn,* 2021 WL 165121, at *9 (refusing to certify class in data breach case because individual issues of injury and causation predominated, including the issue that a large number of class members had suffered no injury at all). In this case, Plaintiffs cannot meet the requirements to establish Rule 23(b)'s predominance because individualized issues would swamp this case.

**(b.) Individualized questions of duty, causation and injury defeat a finding of predominance.**

As discussed above, Plaintiffs cannot establish commonality for any of the core issues in this case – duty, causation or injury. Having failed to meet the commonality requirement necessarily means that Plaintiffs fail the much more stringent predominance analysis. "When large numbers of class members can only establish injury through

individual proof, the resulting inefficiency defeats predominance. And it is no answer to inefficiency to presume injury without reliable classwide evidence and thus deny the defendants the right to raise potentially meritorious defenses." *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2020 WL 5778756, at *16 (E.D. Va. Aug. 14, 2020), *report and recommendation adopted,* No. 2:18MD2836, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021). As one California court explained, data breach cases are ill-suited to a finding of predominance:

> [T]he case here would require an assessment of each putative class member's circumstances to determine whether his or her information was viewed by an unauthorized party and whether the data breach caused this breach of confidentiality. This assessment includes questions regarding whether third parties used plaintiffs' information, whether this use was without authorization, the timing of this misuse, whether plaintiffs took measures to protect against the misuse of their information, whether the information used was involved in the data breach, and whether third parties could have obtained this information through other means.

*Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 222, 300 Cal. Rptr. 3d 32, 49 (2022), *review denied* (Jan. 25, 2023) (denying class certification in a data breach case). So, too, in this case should certification be denied because individual issues of duty, causation and injury predominate.

**(c.) Class certification is also improper because class members are uninjured.**

The individual inquiries into class members' injuries demonstrates another reason why class certification is improper: there is no evidence that class members have suffered any injury at all caused by the Data Incident. Even if evidence of misuse is later discovered, the fact that it has been almost four years since members' data was first exposed makes it

highly unlikely that more than a tiny percentage of the class will be able to prove injury. While a class can support a small number of individuals who have suffered no actual injury, it is improper to certify a class containing large numbers of uninjured members. *McGlenn,* 2021 WL 165121, at *9 (refusing to certify class in data breach case in part because a large number of class members had suffered no injury); *Kohen v. Pac. Inv. Mgmt. Co. LLC,* 571 F.3d 672, 677 (7th Cir. 2009) ("a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant."); *Dawson v. Great Lakes Educ. Loan Servs., Inc.*, No. 15-CV-475-BBC, 2016 WL 5415096, at *3 (W.D. Wis. Sept. 28, 2016) ("A district court cannot certify a class including a large number of persons that have not suffered a tangible injury."); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 142 (D. Md. 2022) ("the presence of 'a large number of uninjured persons' in a proposed class would undermine predominance.").

As discussed above, there is no evidence that the class members' data was actually exposed to criminal third parties during the Data Incident, thus defeating any attempt to establish injury that was causally related to the non-existent breach. Even if the Data Incident in this case involved an actual breach–*i.e.*, an unauthorized access by a third party (which it did not)–a large portion of the class would nonetheless remain uninjured due to the breach. For example, as explained above, the data for some of the class members involved only publicly available data, thus negating a causal link between any alleged injury, such as identity theft, and the Data Incident. A large percentage of the class are also likely to have experienced prior data breaches, which are more likely to be the cause

of any alleged identity theft or other injuries. (Ex. 11, Guerra Report ¶¶ 56-59; and *supra* n. 12, https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/). More significantly, because the Dark Web searches establish that none of the PHI or PII from the Data Incident can be found on the dark web (*supra*, Section II.C.1) it is unlikely that any of the class members will be able to establish the requisite elements of causation and injury as there is no proof that any disclosure has led to the actual misuse of the data. In short, the proposed class contains an improperly large amount of uninjured class members and should not be certified.

**(d.) Choice of law issues also defeat a finding of predominance.**

**(1.) Plaintiffs bear the burden of establishing which laws apply and the absence of conflicts.**

In a nationwide, state law-based diversity class action, as is the case here, inherent in the predominance inquiry is a determination of which states' substantive laws will apply to the claims. *See, e.g., Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007). This is because in a multi-state class action, variations in state law may swamp any common issues and defeat predominance. *See, e.g., Georgine v. Amchem Prods.,* 83 F.3d 610, 618 (3d Cir.1996) (decertifying class because legal and factual differences in the plaintiffs' claims "when exponentially magnified by choice of law considerations, eclipse any common issues in this case").

Plaintiffs bear the burden of establishing which laws apply between the various potential jurisdictions, including providing "an extensive analysis of state law variations to

reveal whether these pose insuperable obstacles." *Cole*, 484 F.3d at 724 (internal quotations and citations omitted). Here, in a proposed nationwide class based on numerous common law claims (negligence, breach of fiduciary duty, invasion of privacy, breach of contract, and unjust enrichment) and based on the consumer protection acts of two different states (Washington and Missouri), significant conflict of law issues exist.

**(2.) Significant conflicts exist.**

Instead of attempting to carry their burden of providing a detailed analysis of each states' laws, Plaintiffs simply assert in a conclusory manner that there are no conflicts among the 50 states for their numerous common law claims. Motion, 18-19. If a plaintiff fails to provide a detailed analysis of the variations of each state's laws, she fails to meet the requirements of the predominance analysis. *Id.* 725-26 ("We conclude that plaintiffs did not sufficiently demonstrate the predominance requirement because they failed both to undertake the required "extensive analysis" of variations in state law concerning their claims and to consider how those variations impact predominance.").

Plaintiffs' position that Texas law should apply is also directly at odds with their Washington and Missouri consumer protection act claims. By asserting these claims Plaintiffs are necessarily asserting that significant contacts exist with at least those two states, requiring a full conflicts analysis among the three states (Texas, Washington and Missouri). Plaintiffs also seek, without any explanation, to certify a subclass for Missouri, thus opening the door to other potential subclasses for all 50 states.

If Plaintiffs had engaged in the required conflicts analysis, it would need to include not only Plaintiffs' claims, but MedData's affirmative defenses, including contributory

negligence. Even a brief survey of states' laws reveals that there is a wide variety among the 50 states as to how to address contributory negligence. For example, some jurisdictions apply pure contributory negligence, which prohibits plaintiffs who are at fault from receiving damages. *See, e.g.,* Ala. R. Civ. P. 8. Other jurisdictions apply modified comparative negligence laws with different fault thresholds, allowing plaintiffs who are less than 50 or 51 percent at fault to recover damages. *See, e.g.*, 42 Pa. Cons. Stat. § 7102.

Similarly, negligence claims seeking economic loss (as in this case) raise the issue of whether the economic loss doctrine applies. Application of the economic loss doctrine varies greatly among the states. For example, in Washington, the economic loss doctrine (now called the independent loss doctrine) precludes recovery for economic loss in tort when a relationship is governed by a contract, unless an independent duty to the plaintiff is breached. *See, e.g., SOP, LLC v. DWP Gen. Contracting, Inc.*, No. 56061-5-II, 2022 WL 17590865, at *4 (Wash. Ct. App. Dec. 13, 2022). In other jurisdictions, the economic loss doctrine bars recovery of purely economic loss as tort damages absent accompanying personal and property damage. *See, e.g., Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175-78 (3d Cir. 2008); *Zurich Am. Ins. Co. v. Hughes, Watters & Askanase, L.L.P.*, No. 11-05-00044-CV, 2006 WL 1914689, at *2 (Tex. App. July 13, 2006); *see also In re TJX Cos. Retail Sec. Breach Litig.*, 524 F. Supp. 2d 83, 92 (D. Mass. 2007) (same); *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1103 (N.Y. 2001) (same).

There are also great variations among the states for the common law claim of invasion of privacy. *See, e.g., Donastorg v. Daily News Publ'g Co.*, 63 V.I. 196, 319 (V.I.

Super. Ct. 2015) (comparing causes of action for invasion of privacy across the 50 states and noting that 43 have a common law cause of action, four have statutory claims, and two jurisdictions reject the cause of action; also noting the variations in the requirements for the claim, including the level of offensiveness and nature of the intrusion); *see also Howard v. Aspen Way Enterprises, Inc.*, 2017 WY 152, ¶ 14, 406 P.3d 1271, 1275 (Wyo. 2017) (noting variations in state privacy claims). In short, there are significant conflicts among the 50 jurisdictions regarding Plaintiffs' claims. Plaintiffs have not even attempted to meet their burden in showing why these conflicts will not swamp this case and defeat predominance.

**(e.) The need or individual damage assessments defeats predominance.**

Finally, the inability to determine damages on a class-wide basis defeats predominance. While some variations in damages among class members may not defeat predominance, when the need for individualized damage calculations becomes too great it swamps the litigation and makes class certification inappropriate. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S. Ct. 1426, 1433 (2013) ("Questions of individual damage calculations will inevitably overwhelm questions common to the class."); *see also, e.g., Fleming v. Select Portfolio Servicing*, 342 F.R.D. 361, 366-67 (D. Mass. 2022) (denying class certification in part because individual damage issues destroyed predominance). Plaintiff's proposed damage methodology in this case fails for many reasons, but for certification purposes the most crucial failure is that the method cannot accurately calculate damages on a class-wide basis.

As explained in more detail in MedData's Motion to Exclude Testimony of Gary Olsen (incorporated herein by reference) ("Motion to Exclude"), Plaintiffs' purported damages expert, Gary Olsen, has not provided reliable methods or sufficient data supporting Plaintiff's proposal that class members' damages caused by the Data Incident are ascertainable on a class-wide basis. Olsen's opinions rely entirely on speculation, unreliable data and/or irrelevant data. (*See* Def's Mtn. to Exclude, filed concurrently with this opposition). His methodologies to establish class-wide damages under Rule 23 are not generally accepted in the industry and do not reasonably align with the damages theories presented by Plaintiffs. *Id.*

Specifically, Olsen's assumption that a single value estimate can be employed for each of his four categories of putative class member data is speculative and incorrect. *Id.*, 8-9. Instead, the inquiry into damages will require a highly individualized assessment for each class member (Ex. 11, Gurrea Report at ¶¶ 51-72), which defeats a finding of predominance.

**4. A class is inappropriate under 23(b)(2) because injunctive relief is moot.**

A class can be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class . . . ." *Wal-Mart Stores, Inc.*, 564 U.S. at 360-61. In order to pursue injunctive relief, which is a prospective remedy, a plaintiff must allege an injury that is "actual and imminent, not conjectural or

hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009). Where the harm referenced in the requested relief refers to a ceased activity or no longer present practice, it is moot and cannot serve as a predicate for Rule 23(b)(2) certification. *In re Marriott Int'l, Inc.*, 341 F.R.D. at 171 (Consumers failed to provide evidence of some present or likely future harm regarding their PII to support declaratory or injunctive relief where system that was used during the data breach was offline and retired).

Certification under Rule 23(b)(2) is improper in this case because Plaintiffs have not identified any imminent, non-speculative, actual injury that would occur absent injunctive relief. Instead, the events of this case focus on a unique, one-time incident (the Data Incident) that has already been rectified. The employee Bobby Faruqi no longer works at MedData and MedData has already provided further training and security measures to ensure that no future employee would make the same mistake. (Ex. 1, Briggs Dep. at 96:18 – 98:5). Any injunctive relief would thus be moot and inappropriate.

## IV.
## CONCLUSION

Plaintiffs have failed to establish the threshold issue of standing and have also fallen far short of meeting Rule 23's certification requirements. For these and the reasons set forth above, MedData respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**

By: *<u>/s/Ethan Carlyle</u>*
Ethan D. Carlyle
State Bar No. 24031794
Southern District No. 30741
ethan.carlyle@wilsonelser.com
909 Fannin St., Suite 3300
Houston, Texas 77010
Tel: (713) 353-2000
Fax: (713) 785-7780

**ATTORNEY-IN-CHARGE FOR DEFENDANT MED-DATA, INC.**

**ARETE LAW GROUP PLLC**

By: *<u>/s/ Ralph H. Palumbo</u>*
Ralph H. Palumbo, WSBA No. 4751
Lynn M. Engel, WSBA No. 21934
1218 Third Avenue, Suite 2100
Seattle, WA 98101
Phone: (206) 428-3250
Fax: (206) 428-3251
rpalumbo@aretelaw.com
lengel@aretelaw.com

**OF COUNSEL:**

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**

Michael F. Webb
State Bar No. 24118218
S.D. Tex. No. 3586792
michael.webb@wilsonelser.com
909 Fannin St., Suite 3300
Houston, Texas 77010
Tel: (713) 353-2000
Fax: (713) 785-7780

## CERTIFICATE OF WORD COUNT

I hereby certify that this document complies with Rule 18 of this Court's Procedures, being 8,655 words, exclusive of the case caption, table of contents, table of authorities, signature block, and certificates.

*/s/Ethan D. Carlyle*
Ethan D. Carlyle

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, a true and correct copy of the foregoing instrument was delivered to all parties and counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/Ethan D. Carlyle*
Ethan D. Carlyle