UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| M.S. and D.H., individually and on behalf of all others similarly situated,<br>*Plaintiffs*,<br><br>v.<br><br>MED-DATA, INC.,<br>*Defendant*. | C.A. No. 4:22-cv-187<br><br>Hon. Charles Eskridge<br><br>JURY DEMANDED |

DEFENDANT MED-DATA, INC.'S MOTION TO STRIKE THE REPORT AND TESTIMONY OF GARY OLSEN

# TABLE OF CONTENTS

INTRODUCTION ..... 1

NATURE AND STAGE OF THE PROCEEDING ..... 1

ISSUE REQUIRING RESOLUTION AND STANDARD OF REVIEW ..... 2

FACTS ..... 2

SUMMARY OF THE ARGUMENT ..... 2

ARGUMENT AND AUTHORITIES ..... 3

A. Olsen's testimony is inadmissible for purposes of class certification. ..... 3

B. Olsen's methodology for estimating transaction values for PII/PHI on the dark web is unreliable. ..... 5

1. The class definition Olsen uses in his proposed damages methodology is speculative. ..... 5

2. Olsen does not propose a methodology for collecting dark web transaction data. ..... 6

3. Olsen's estimates of dark web transaction values are unreliable. ..... 8

C. Olsen's methodology for quantifying damages from unauthorized access is flawed and unreliable. ..... 9

1. Olsen's methodology is flawed because it is built on his unreliable dark-web values. ..... 9

2. Olsen's assumption that his dark web transaction values can measure value of access is speculative. ..... 9

3. Olsen's application of the market approach to value access to PII and PHI is flawed. ..... 10

(a.) Olsen incorrectly assigns single value estimates to diverse groups of Class members. ..... 12

(b.) Olsen's purported benchmark transactions values for each of his four categories do not appear to be similar transactions. ..... 12

D. Olsen's methodology for quantifying damages from increased future risk is speculative. ..... 13

1. Olsen does not propose a methodology for measuring increased risk attributable to Defendant's actions. ..... 13

2. Olsen's proposed methodology for quantifying damages from increased risk is flawed and speculative. ..... 14

E. Olsen's methodology for quantifying damages from unjust enrichment on a class-wide basis is flawed. 17

CONCLUSION 19

# TABLE OF AUTHORITIES

## FEDERAL STATUTES AND RULES

Fed. R. Evid. 702 advisory committee's note .......... 4

## FEDERAL CASES

*Anderson v. Bristol Myers Squibb Co.*, CIVIL ACTION NO. H-95-0003, 1998 U.S. Dist. LEXIS 23259 (S.D. Tex. 1998) .......... 4
*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .......... 3
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) .......... 4
*Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579 (1993) .......... 4
*In re Behr Dayton Thermal Prods., LLC*, No. 3:08-CV-326, 2015 WL 13651286 (S.D. Ohio 2015) .......... 3
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......... 4
*Milward v. Rust-Oleum Corp.*, 820 F.3d 469 (1st Cir. 2016) .......... 4
*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) .......... 3
*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......... 5
*Wells v. SmithKline Beecham Corp.*, 601 F.3d 375 (5th Cir. 2010) .......... 4

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendant Med-Data, Inc. ("Defendant" or "Med-Data") files this Motion to Strike the Report and Testimony of Gary Olsen and, in support thereof, respectfully shows the Court as follows:

## I.
## INTRODUCTION

This putative class action arises out of a data security incident that resulted in the inadvertent exposure of certain personal health data and personal identifying information ("PHI/PII"). In essence, Plaintiffs allege that the data security incident resulted in their private personal and health data being exposed to the public, placing them at an increased risk of identity theft and similar crimes.

## II.
## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs filed a Class Action Complaint on August 9, 2021 for eleven causes of action relating to the Data Incident, all based on the unsupported speculation that the Data Incident involved a breach by unauthorized third-party and misuse of the Plaintiffs' data. (Pl.'s Compl., ECF No. 1, ¶¶ 116-221.) MedData filed a motion to dismiss for lack of standing on August 31, 2022 [ECF No. 55], which has been fully briefed. Despite the fact there is no evidence that their data was ever accessed or misused by unauthorized third parties, Plaintiffs are now moving to certify a class action and rely on Olsen's purported expert opinions on damages in support. Because Olsen and his opinions fail to meet the requisite standards for admissible expert testimony, the Court should not consider them in

its decision on Plaintiff's Motion for Class Certification. As such, Defendant files this Motion to Strike, along with its Opposition to Plaintiff's Motion for Class Certification.

## III.
## ISSUE REQUIRING RESOLUTION AND STANDARD OF REVIEW

The issue before the Court is whether it should strike the testimony and report of Plaintiff's purported damages expert, Gary Olsen, in its consideration of whether to certify this matter as a class action. The applicable standard of review is found in Rule 702 of the Federal Rules of Evidence and in the case of *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and its progeny.

## IV.
## FACTS

Defendant incorporates the facts from Defendant's Opposition to Plaintiff's Motion for Class Certification, filed contemporaneously with the instant motion, as if fully restated herein.

## V.
## SUMMARY OF THE ARGUMENT

Plaintiffs' purported damages expert, Gary Olsen, has not provided reliable methods or sufficient data supporting their proposal that class members' damages caused by the Incident are ascertainable on a classwide basis. Olsen's opinions rely entirely on speculation, unreliable data and/or irrelevant data. His methodologies to establish classwide damages under Rule 23 are not generally accepted in the industry and do not reasonably align with the damages theories presented by Plaintiffs. Olsen's methodologies rely on inquiries into an individual's risk of identity theft, the market for personal

information and on complicated surveys or sampling techniques to eliminate individual issues among class members, yet he is not an expert in any of these fields. Olsen is a Certified Public Accountant and Certified Patent Valuation Analyst. (Ex. 1, Olsen Report, App'x A, at 4.) Neither of these professions relate to cyber security or data breaches, and he has never been qualified by a court as an expert on these topics. (Ex. 2, Olsen Dep. 127:24-128:10). For these reasons, the Olsen's report must be excluded for purposes of evaluating Plaintiffs' Motion for Class Certification.

## VI. ARGUMENT AND AUTHORITIES

### A. Olsen's testimony is inadmissible for purposes of class certification.

In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the Supreme Court reversed certification of a class action and reaffirmed that class certification requires a "rigorous analysis" of plaintiff's damages model that bore on the propriety of class certification. A damages expert's opinion "is crucial" at the class certification stage where "it provides the sole basis for Plaintiffs' claim that damages are calculable on a class-wide basis." *In re Behr Dayton Thermal Prods., LLC*, No. 3:08-CV-326, 2015 WL 13651286, at *6 (S.D. Ohio 2015). In *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005), the Fifth Circuit recognized that "[i]n many cases, it makes sense to consider the admissibility" of expert testimony at certification, because "[i]n order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable." Here, the

Court should exclude Olsen's testimony seeking to establish Plaintiffs' ability to prove class-wide damages and deny class certification for failure to demonstrate commonality.

The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony satisfies those standards. *See* Fed. R. Evid. 702 advisory committee's note; *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 592, n.10 (1993). Under Rule 702, the district court serves as the gatekeeper for expert testimony by "ensuring that [it] . . . both rests on a reliable foundation and is relevant to the task at hand." *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016) (citing *Daubert*, 509 U.S. at 597).

The district court may consider "whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378-79 (5th Cir. 2010) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Courts further caution against expert testimony when, like Olsen's, their opinions have been developed expressly for purposes of testifying in litigation, as opposed to testifying about matters growing naturally and directly out of research they have conducted independent of the litigation. *Anderson v. Bristol Myers Squibb Co.*, CIVIL ACTION NO. H-95-0003, 1998 U.S. Dist. LEXIS 23259, at *8-9 (S.D. Tex. 1998) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (explaining that "independent research carries its own indicia of reliability" since it was conducted in the usual course of

business and must satisfy a variety of standards to attract funding and institutional support; "experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration"), *cert. denied*, 516 U.S. 869 (1995))).

Moreover, classwide damages models based on extrapolation of aggregated and estimated data are not reliable where an aggregate number will be derived from a sample of class members rather than the whole despite unique differences across the class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366-67 (2011) (disapproving of proposal to extrapolate damages from analysis of random subset of class members).

### B. Olsen's methodology for estimating transaction values for PII/PHI on the dark web is unreliable.

#### 1. The class definition Olsen uses in his proposed damages methodology is speculative.

Olsen admitted that he does not have an opinion as to whether the 3,700 proposed class members, whose data was limited to name and birth date, or name, address, telephone number and date of birth, constitute PII or PHI. (Ex. 2, Olsen Dep. 6:17-8:12.) Yet he included those 3,700 patients in his damages model. (*Id.* at 8:13-9:1.) Olsen also admitted that he does not know whether an individual is damaged by a data breach if his or her sensitive information were accessible on a public website, but no unauthorized person viewed or copied the information. (*Id.* at 10:16-25.)

No evidence in this case establishes that anyone other than Faruqi (the former MedData employee who uploaded files to GitHub), Jelle Ursem (the ethical hacker who found MedData's information on GitHub), and Kevin Bassett (MedData's Chief

Technology Officer who investigated the Incident) viewed or copied Faruqi's GitHub files. Yet Olsen included all patients whose data was uploaded to GitHub in his damages model. (*Id.* at 15:16-16:5, 17:18-19, 20:7-17.)

**2. Olsen does not propose a methodology for collecting dark web transaction data.**

Olsen's methodology for calculating damages to class members' data is based on purported average actual transaction values for similar data traded on the dark web. (Ex. 1, Olsen Report ¶ 6). As explained by MedData's rebuttal expert, Stuart Gurrea, Olsen does not propose a reliable method for estimating average dark web transaction values. (Ex. 3, Gurrea Report ¶ 24). Nor does Olsen propose any methodology for identifying actual transaction data or for collecting representative transaction (or any other transaction) data. (*Id.* at ¶ 25.)

First, Olsen's collection of data fails to distinguish between *transaction* values and *listed* or ask prices. Olsen admits that the dark web values he uses are (with a few exceptions) offers for sale, not actual sales of PII or PHI. (Ex. 2, Olsen Dep. 56:24-57:15, 68:5-21, 90:24-91:3.) At the same time, he admits that he does not know whether offer prices on the dark web would be greater than or less than sale prices. (*Id.* at 92:12-16.) A report by Symantec, which Olsen relies on, warns that "[w]e cannot verify if the goods are genuinely sold for the asked price, some of them might be fake offers." (Ex. 1, Olsen Report ¶ 28.)

Second, Olsen does not and cannot assess the quality or reliability of the data he relies on. The dark web values Olsen reports as a basis for estimating the value of class

members' data are *not* derived from data he collects or analyzes directly. Instead, Olsen's data consists of incomplete information extracted from a collection of news articles, blogs and reports. (*Id.*) Olsen admits that he has never done any research or investigation to determine whether the sources he uses for dark web offer prices are authoritative and reliable. (Ex. 2, Olsen Dep. 72:24-73:13.) He says merely, "I have never seen any reason to doubt any of these sources." (*Id.*) Olsen further admits that he does not know whether the values in the sources he relies were based on actual offers on the dark web, (*Id.* at 76:1-25; 78:3-11,) saying, "That was not a prerequisite for including the values. (*Id.* at 77:1-17.) Instead, he says that he simply "assumed the information was reliable." (*Id.* at 77:18-23; 78:12-16.) This approach to collecting data provides anecdotal evidence at best, but falls far short of representing a reliable methodology for collecting comprehensive transaction data from which to determine the value of dark web transactions. (Ex. 1, Olsen Report ¶ 31.) Olsen also cannot identify from his sources either the date of the source publication or the date of the data collection for forty percent of the PHI observations he relies upon. (*Id.* at ¶ 30.)

Third, Olsen does not report or propose any methodology for collecting relevant data, nor does the data Olsen reports purport to be a comprehensive set of relevant transactions. Olsen simply reports a list of purported transaction values without describing any selection criteria for inclusion in his list. Since Olsen does not describe a representative (or any other) sampling methodology, his data collection is *ad hoc*, his sample unrepresentative, and his overall methodology for estimating the transaction values of PII and PHI data on the dark web is unreliable.

**3. Olsen's estimates of dark web transaction values are unreliable.**

Olsen estimates dark web transaction values for the four categories of data he defines (PII – Partial Fullz, PII – Fullz, PHI – Limited, and PHI – Comprehensive) by first assigning the dark web values he collects to these four categories and, second, by calculating the statistical mean of the values assigned to each of the four groups. (Ex. 1, Olsen Report, ¶¶ 46, 47, 50, Schedules 3-5.) As a threshold matter, these averages are based on data that is unreliable. Therefore, the averages of unreliable data are also unreliable and cannot be interpreted as representative measures of actual dark web transaction values. (Ex. 3, Gurrea Report, ¶¶ 35-36.)

Olsen's proposed calculation requires assigning the data he collected to these four defined groups. But because Olsen does not have access to actual raw transaction data, his categorization of data is unreliable. This is apparent from the fact that the twenty-five observations he used to calculate the average for PHI – Comprehensive also include the eleven observations he used to calculate the average for the PHI – Limited. (Ex. 1, Olsen Report, at Schedule 3.) This calculation is incorrect, because by Olsen's own definition, the groups should be mutually exclusive. (Ex. 3, Gurrea Report, ¶ 38 (citing Olsen Report, at Schedule 3).)

In addition, Olsen's damages methodology uses widely varying dark web offer, as much as $1 to $1,000 dollars. Olsen admits that he can't say why the offers vary so widely, yet his damages methodology uses the average of all the offers he found because he "has no reason to give weight to one over another." (Ex. 2, Olsen Dep. 59:19-60:19, 64:1-9.)

**C. Olsen's methodology for quantifying damages from unauthorized access is flawed and unreliable.**

**1. Olsen's methodology is flawed because it is built on his unreliable dark-web values.**

Olsen proposes to measure the value of access to class members' data using his averages of dark web transaction values. (Ex. 1, Olsen Report 17, at Table 7.) According to Olsen's methodology, the value of access to class members' data can be measured by his estimates of the value of PII and PHI data on the dark web. For the reasons described above, the methodology he proposes for estimating the transaction values of PII and PHI data on the dark web is flawed and yields unreliable estimates. Therefore, any estimates of the value of access based on his unreliable estimates of transaction values on the dark web are also unreliable. (*See* Ex. 3, Gurrea Report, ¶¶ 40-41.)

**2. Olsen's assumption that his dark web transaction values can measure value of access is speculative.**

Olsen draws an analogy between his proposed methodology and the use of reasonable royalties as a measure of harm to a patent holder from unauthorized use of their patent. (Ex. 1, Olsen Report 16-17.) Olsen proposes to use dark web transaction values as a measure of revenues class members could have earned from the sale of their personal data on the dark web.

This approach is fundamentally flawed because it is predicated on class members selling their own PII and PHI on the dark web for illicit purposes as a viable revenue-generating opportunity. Olsen has not identified any evidence that class members could or would have monetized their PII and PHI on the dark web. (*Id.* at ¶¶ 42-43.) In fact, Olsen

admits that fear of fraudulent use would prevent proposed class members from selling their PII and PHI. (Ex. 2, Olsen Dep. 96:2-10.)

**3. Olsen's application of the market approach to value access to PII and PHI is flawed.**

According to Olsen, "[t]he value of this transferred information can be measured using the Market Approach, a common valuation method." (Ex. 1, Olsen Report 7.) The Market Approach to valuation consists of valuing an asset based on "how similar assets are priced in the marketplace." (Ex. 3, Gurrea Report ¶ 46.) But, as Gurrea explains, "This approach is predicated on the theory that transaction values reflect the fundamental value of the asset. Therefore, similar assets should command similar prices in the market." (*Id.*) While this approach is predicated on the comparability between the asset being valued and the assets for which actual transaction data is available, Olsen's methodology fails to establish this comparability, thus the resulting estimates of "lost access" value are unreliable. (*Id.* at ¶¶ 45-46.)

A first dimension to establish comparability is the time period. Typically, the value of an asset varies over time with changes in supply and demand. The sources Olsen relies on indicate that the transaction prices for personal information vary significantly over time. (*Id.* at ¶ 47.) In another instance, one of the sources Olsen relies on indicates that "[t]he debate still remains open on exactly how much they [medical records] are worth. Estimates from experts say the resale value of a medical record is from $70 to $100 each depending on how comprehensive it is and what type of patient it belongs to." (*Id.* at ¶ 48 (citing Olsen Report at Schedule 3).) Olsen's report, however, also references a September 2019 article,

that explains "more recent news revealed that you can now buy medical records from $20 to $50." (*Id.*) Olsen, inexplicably, ignores that the lower values were observed during the relevant period. Instead, Olsen only includes in his calculation a value of $85 – the mid-point of the reported, but apparently dated, $70-$100 range. (*See id.*)

Since Olsen does not have access to raw data, he cannot assess whether the values he reports are from periods with different market conditions that would invalidate their use as benchmarks for valuation. Gurrea summarizes the nine-year time period for the data Olsen considered, 2013 through 2021. (*Id.* at Ex. 4.) For forty percent of the PHI data, Olsen does not identify the date of the source publication or the date of the data. Among the remaining sixty percent, twenty-four percent are dated between 2011 and 2013. Moreover, Olsen could not date any of the PHI data he relies on. (*Id.* at ¶ 49.)

There are dimensions other than time that affect the comparability of transactions. For example, Olsen states that: "[f]actors that can influence pricing include: the extent and the privilege level of the access; the size and value of the victim as a source of criminal revenue; the industry and location of the victim; and the sales strategies of the various sellers." (Ex. 1, Olsen Report, ¶ 36.) Olsen does not assess whether the actual market values he considers as benchmarks are similar in these or other dimensions. For example, as shown by Gurrea, class members are associated with a diverse set of geographical locations (over 10,000 ZIP Codes represented) and numerous health care facilities. (Ex. 3, Gurrea Report, at Ex. 5.) Olsen does not assess whether his benchmark values are applicable to individuals from such diverse locations. (*Id.* at ¶ 50.)

**(a.) Olsen incorrectly assigns single value estimates to diverse groups of Class members.**

The market-based approach to valuation consists of valuing a target asset using actual transaction prices for comparable assets. Rather than valuing access to each class member's information, Olsen assigns class members to one of the four categories of data, and then values access to each of the four categories. But Olsen fails to demonstrate that the groups he defines are sufficiently homogenous to assume that a common transaction value can be used to estimate reliably the value of access to information for each class member included in the group. The class members he assigns to each category were subject to the exposure of different amounts and types of information. While Olsen estimates access values for only his four categories, there are forty-two different types of bundles of information exposed. For example, Olsen categorizes 61,070 class members with 19 different data profiles as PHI-Comprehensive. (Ex. 1, Olsen Report at Schedule 7.) Similarly, Olsen categorizes 33,963 class members with 9 different data profiles as PHI-Limited. (*Id.*) Olsen's assumption that a single value estimate can be employed for each of his four categories is speculative and incorrect. (*See* Ex. 3, Gurrea Report, ¶¶ 51-53.)

**(b.) Olsen's purported benchmark transactions values for each of his four categories do not appear to be similar transactions.**

Olsen's proposed market-based valuation also requires identifying actual market transaction data for each of the four categories of information disclosures he identifies. It is apparent from the data Olsen collects that his artificial categorization does not correspond to the data he collects. For example, Olsen reports dark web values for "PII Fullz" ranging from $0.05 to $40 and assumes these are equally comparable transactions.

(Ex. 1, Olsen Report ¶ 46.) This non-uniformity in observations shows the values are not comparable. In other words – Olsen's method is equivalent to considering properties sold at $5 dollars per square foot and $4,000 per square foot as comparable transactions.

### D. Olsen's methodology for quantifying damages from increased future risk is speculative.

#### 1. Olsen does not propose a methodology for measuring increased risk attributable to Defendant's actions.

According to Olsen, "[a]s a consequence of the Data Breach, the Named Plaintiff and the class members are at an increased risk of harm, including potential identity theft and fraud." (Ex. 1, Olsen Report ¶ 58.) Olsen, however, does not identify a method for quantifying any potential increase in risk to class members attributable to Defendant. In particular, Olsen does not identify any methodology to assess on a classwide basis whether individual class members were exposed to ongoing risk of identity theft and fraud from sources other than Defendant's alleged actions, or to what extent each individual faced materially greater risk because of Defendant's alleged actions. (*See* Ex. 3, Gurrea Report ¶¶ 55-56.)

Exhibits 8A and 8B to the Gurrea Report list the largest healthcare data breaches since 2005 and 2011, respectively. A reason for the increase in healthcare data breaches in recent years is that health care organizations sell medical records to researchers after removing certain identifying information like patient names. They don't need patient consent to use de-identified data. In practice, however, it has been shown that it is possible to determine the personal identity of a de-identified medical record by combining the data with other sources of data ("re-identification"). (Ex. 3, Gurrea Report, ¶ 57.)

It is unreasonable, more generally, to assume that class members would not be exposed to any risk of identity theft or fraud without Defendant's alleged actions. Olsen has not identified a method to measure on a classwide basis whether class members were or would be exposed to the risk of identity theft or fraud, or the level of such risk or fraud, without Defendant's alleged actions. The sources Olsen relies on report extensively about stolen ID, personal data, and hacked accounts related to personal finance, travel, proof of identity, social media, software, communication, online dating, entertainment, news and magazines, food, email fraud, and online shopping. (*See* Ex. 3, Gurrea Report, ¶¶ 53-54.)

**2. Olsen's proposed methodology for quantifying damages from increased risk is flawed and speculative.**

Olsen proposes to measure the "amount of damages suffered by Named Plaintiff and class members due to the increased risk exposure from the Data Breach." (Ex. 1, Olsen Report 7.) Olsen measures damages as the cost of insurance to offset the purported increased risk. (*Id.* at ¶ 59.) As a threshold matter, Olsen's "Increased Future Risk Damages" concerns the likelihood that harm will be caused in the future. As such, this category of damages does not concern compensation for past economic losses class members have suffered.

First, Olsen does not propose a method for measuring the increased risk to each individual class member attributable to Defendant's alleged conduct. Without a method for measuring the increased risk, it is not possible to assess the cost to insure against an incremental amount of risk caused by Defendant's alleged conduct. For example, some class members only had their names stolen and it is not apparent that they face increased

risk. Olsen has not determined whether this quantification can be done on a classwide basis. Given the many and diverse sources of risk of identity theft, this type of assessment would not be amenable to a programmatic assessment on a classwide basis and an individualized class-member-by-class-member analysis would be necessary for assessing underlying individual risk profiles based on individual characteristics and behavior. (*See* Ex. 3, Gurrea Report ¶ 65.)

Second, the behavior of proposed class members establishes – contrary to Olsen's assumptions – that class members did not perceive a risk of future misuse. MedData offered all 142,000 class members 12 months of credit monitoring and identity theft insurance and only 4,000 (approximately 3 percent) accepted this insurance. (Exhibit 5 attached hereto, Declaration of Tom Birchfield ("Birchfield Decl.") at ¶2).

Third, Olsen's measurement of the cost of offsetting increased risk through insurance as the average annual fee for identity theft protection times a defined number of years of protection is speculative. Olsen assumes that class members with exposed PII information will require two years of risk offset and that class members with exposed PHI information will require at least ten years of risk offset. Olsen's assumptions are unsupported and speculative as he offers no basis to assume that PHI exposure requires a longer offset period or an offset of at least five times the offset period for PII exposure. (*See* Ex. 3, Gurrea Report ¶ 66.) Moreover, Olsen admits that the ten-year period he opines as necessary for having identity theft protection is not based on any data that documents the period of identity theft protection actually purchased by individuals who experience PHI exposure as a result of a data breach. (Ex. 2, Olsen Dep. 113:11-15.) The same is true

of Olsen's two-year period. Finally, it is speculative to conclude that the amount of protection a defendant is willing to pay to avoid litigation risk is a reliable measure of the cost to offset increased risk from PII exposure in this case, since litigation risk depends on the specific facts of each case.

Fourth, Olsen's methodology is nonsensical. He admits that the class members' risk of future identity theft or healthcare fraud began when their data was first exposed in 2018. (Ex. 2, Olsen Dep. 108:10-17, 129:12-16.) Olsen values the risk of future fraudulent use of class members' data as equal to the cost of purchasing identity theft protection for two or ten years. (*Id.* at 129:17-130:13.) But despite those admissions, Olsen testified that class members' damages from increased risk are the same if measured in January 2021 or January 2041. (*Id.* at 129:22-131:10.)

Fifth, Olsen's proposed methodology relies on data for seven plan providers who offer credit monitoring with $1 million insurance to estimate the cost of insurance. The highest insurance cost per month Olsen reports ($23.95) is more than four times the smallest price per month he reports ($4.49). (Ex. 1, Olsen Report 19, Table 8.) As with his selection of dark web transaction data, Olsen does not propose any methodology for drawing a representative sample of insurance costs. A statistically sound sampling methodology is of particular importance given the broad range of prices of purportedly homogeneous insurance products that Mr. Olsen reports.

Finally, Olsen does not explain why $1 million in protection is necessary for all class members and why he did not choose cheaper insurance products offering less protection for class members that require less protection. For example, he includes the

$19.99 price for Lifelock "Ultimate Plus" plan. (Ex. 1, Olsen Report at Schedule 6.) Lifelock also offers "Standard" and "Advantage" plans that have lower monthly prices – $8.99 and $14.99, respectively. The higher priced insurance alternatives Olsen lists in Table 8, or the average of these alternatives, do not represent cost-effective alternatives to mitigating risk. Thus, going forward, the premium of Olsen's higher cost insurance products (or their average) is not attributable to Defendant's alleged conduct but to class members' failure to mitigate efficiently.

### E. Olsen's methodology for quantifying damages from unjust enrichment on a class-wide basis is flawed.

As an alternative measure of harm, Olsen proposes to quantify damages based on MedData's purported unjust enrichment. Olsen fails to provide a reliable methodology for calculating damages on a classwide basis based on MedData's purported unjust enrichment. Olsen's measurement of unjust enrichment does not quantify any payments made by class members and to what extent these payments represent an overpayment relative to any benchmark such as the value of benefits class members received from services Defendant provided. (*See* Ex. 3, Gurrea Report ¶¶ 73-74.)

Olsen claims "that had the customers of MedData known that it insufficiently safeguarded the PII and PHI of the class, that they would not have used Med-Data's services." (*Id.* at ¶ 75.) Olsen, however, does not provide any basis for his understanding, nor is there any evidence in this case to support his assumption. (*See id.*)

Olsen proposes to measure MedData's total unjust enrichment as the difference between total fees it collected that relate to the proposed class and direct costs associated

with those fees. Olsen indicates that he would determine which direct costs would be appropriately deducted but does not describe the criteria he would use. (*Id.* at ¶ 76.) Olsen does not identify the data he needs, the criteria he would employ to identify deductible costs, nor the calculations he would perform. (*Id.*)

Olsen's proposed calculation of net fees implies that any enrichment associated with the provision of services to MedData's clients are unjust. But Olsen fails to recognize the value that MedData's services provided to its clients and ultimately to class members and, thus, overstates MedData's alleged unjust enrichment from allegedly failing to secure its customers' data. (*Id.* at ¶ 70.) In other words, Olsen's damages model incorrectly assumes that proposed class members obtained no benefit from MedData. A cardinal rule of restitution is that disgorgement damages must account for the value or benefit conveyed to the Plaintiffs. *See, e.g., Kemp v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc.*, 790 F. Supp. 1275, 1277 (W.D. Va. 1992), *aff'd* 64 F.3d 920 (4th Cir. 1995). Courts routinely reject disgorgement damages models that fail to consider the benefit received by the class members. *See, e.g., Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-HSG, 2018 WL 4181896, at *14 (N.D. Cal. Aug. 31, 2018). *Ogden v. Bumble Bee Foods, LLC*, No. 5:12-CV-01828-LHK, 2014 WL 27527, at *13 (N.D. Cal. Jan. 2, 2014). MedData helps patients by making it easier to pay their medical bill or finding the patient other means to pay their bill, such as third-party liability insurance, workman's compensation and Medicaid. (Ex. 4, Briggs Dep. 105:8-106:12.) Olsen admits that he is unaware of the benefits MedData provides to class members. (Ex. 2, Olsen Dep. 124:18-125:9.)

## VII.
## CONCLUSION

For all the above reasons, the Court should exclude the Olsen Report and deny class certification because Plaintiffs have not, and cannot, provide any basis to reliably calculate damages on a classwide basis.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP

By: */s/Ethan Carlyle*
Ethan D. Carlyle
State Bar No. 24031794
Southern District No. 30741
ethan.carlyle@wilsonelser.com
909 Fannin St., Suite 3300
Houston, Texas 77010
Tel: (713) 353-2000
Fax: (713) 785-7780

and

Ralph H Palumbo – *admitted pro hac vice*
rpalumbo@aretelaw.com
Washington State Bar No. 4751
Lynn M Engel – *admitted pro hac vice*
lengel@aretelaw.com
Washington State Bar No. 21934
Arete Law Group PLLC
1218 Third Ave Ste. 2100
Seattle, WA 98101
206-428-3150 – Telephone

**ATTORNEY-IN-CHARGE FOR DEFENDANT MED-DATA, INC.**

**OF COUNSEL:**

WILSON, ELSER, MOSKOWITZ, EDELMAN
& DICKER, LLP

Michael F. Webb
State Bar No. 24118218
S.D. Tex. No. 3586792
michael.webb@wilsonelser.com
909 Fannin St., Suite 3300
Houston, Texas 77010
Tel: (713) 353-2000
Fax: (713) 785-7780

CERTIFICATE OF WORD COUNT

I hereby certify that this document complies with Rule 18 of this Court's Procedures, being 4,983 words, exclusive of the case caption, table of contents, table of authorities, signature block, and certificates.

*/s/Ethan D. Carlyle*
Ethan D. Carlyle

CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, a true and correct copy of the foregoing instrument was delivered to all parties and counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/Ethan D. Carlyle*
Ethan D. Carlyle